UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

CEDRIC DUPREE,
   Plaintiff,

vs.                                          No. 05-1028

GUY PIERCE, et.al.,
   Defendants

## SUMMARY JUDGEMENT ORDER #2

This cause is before the court for consideration of the defendants' motions for summary judgement [d/e 165, 166] and the defendants' motions to strike the plaintiff's response. [d/e 181, 182]

### I. BACKGROUND

The plaintiff in this case originally filed two complaints pursuant to 42 U.S.C.§1983 that the court consolidated into this lead case. *See Dupree v. Pierce*, 05-1028, *Dupree v. French,* 05-1201. The plaintiff's pro se complaints were rambling accounts of numerous incidents. The court appointed counsel for the plaintiff, and identified 21 different claims against 44 defendants.[1]

The court noted that the plaintiff had named an unwieldily number of defendants and claims and encouraged the defendants to file initial summary judgement motions addressing any claims barred by the statute of limitations period or any claims for which the plaintiff had failed to exhaust his administrative remedies pursuant to 42 U.S.C. §1997e(a). *See* December 5, 2006 Court Order. The defendants filed a dispositive motion and on December 21, 2007, the court found the plaintiff had 12 surviving claims against 29 defendants. *See* December 21, 2007 Court Order.

The plaintiff then filed a motion to reconsider this order pointing to errors in the affidavit claiming the plaintiff had not exhausted his administrative remedies for some claims. The motion was granted in part and denied in part. *See* September 22, 2008 Court Order. Consequently, the plaintiff has the following 15 surviving claims before this court: [2]

    1) Dr. Garlick and Dr. Smith were deliberately indifferent to the plaintiff's serious

---

[1] *See* January 5, 2006 Case Management Order in *Dupree v. French,* 05-1201*;* and January 5, 2006 Case Management Order and April 4, 2006 Case Management Order in *Dupree v.Pierce,* 05-1028.

[2] To avoid confusion, the remaining claims still have their original numbers cited in the December 5, 2006 Court Order. *See also* September 22, 2008 Case Management Order; November 3, 2008 Case Management Order.

medical needs when they changed his medications more than twenty-two times to make him appear incompetent and exacerbate his mental health problems.

3) Nurse Ellinger violated the plaintiff's Eighth Amendment rights when she failed to regularly provide his prescribed medications.

5) Defendant Pierce, Bryan Fairchild, Wayne Germaine, Officer Mottershaw, Walker, S. Mote, Rich, Potts, Leonard, DeLong, and Mark Spencer conspired to deny the plaintiff meaningful access to the courts. In addition, the plaintiff told P. Hasting, R. Walker and S. Mote about his denial of access to the courts, but they failed to take any action.

6) On February 17, 2005, Officers Fritsche, French, Ware, Rosenberger Prentice, and Frizzell participated in a conspiracy when they either paid another inmate to assault the plaintiff or asked medical staff not to report or treat the plaintiff's injuries.

7) The plaintiff has also alleged that Defendants Ware, Prentice, Rosenberger and Frizzell violated his Eighth Amendment rights when they were deliberately indifferent to his medical needs on February 17, 2005.

8) The plaintiff alleges that the actions taken by Fritsche, French, Ware, Rosenberger, Prentice, and Frizzell on February 17, 2005 were a violation of his First Amendment rights.

9) The plaintiff says on May 1, 2005, Officer Brewers and Gerdes violated both is Eighth Amendment and First Amendment rights when they used excessive force in retaliation for his grievances and litigation.

10) The plaintiff reported his injuries from May 1, 2005 to Dr. Larson who violated his Eighth Amendment rights when he was deliberately indifferent to the plaintiff's serious medical needs.

12) The plaintiff says from July of 2003 to the present, Dr. Funk has violated his Eighth Amendment rights because he has been deliberately indifferent to plaintiff's serious medical condition when he refused to provide medical care for the blood in plaintiff's urine.

13) The plaintiff states on November 1, 2005, Officer Eckhert painfully pulled on his waist chain and/or hit him with handcuffs and Officer Dahlback did the same on September 7, 2004 violating his Eighth Amendment right to be free from excessive force.

14) The plaintiff says Lieutenant Potter and Officer Barthold denied him medical attention after he was injured on October 16, 2004 in violation of the Eighth Amendment.

16) The plaintiff says on June 13, 2005, Officer Punke violated the Eighth Amendment when he refused to provide needed medical care. The plaintiff says he was on suicide watch and the officer allowed him to have some kind of cutting devise and told the plaintiff to "cut deeper." (Comp, p 5-b)

17) Officers French and Fritsche conspired against the plaintiff and retaliated against him by allowing inmates to attack the plaintiff on October 2, 2004.

> 18) Officers French and Fritsche were deliberately indifferent to the plaintiff's serious medical needs on October 2, 2004 and allowed the attacks in retaliation for previously filed grievances and litigation.
> 21) The plaintiff says from August of 2003 to the present, Defendants Walker, Libby, Hodge, Nolen and Pierce have failed to put him in protective custody or to take any action to protect him. Instead, they continue to place him near dangerous inmates and he continues to be assaulted. The plaintiff alleges failure to protect, conspiracy and retaliation claims against these individuals.
> All claims are against the defendants in their individual capacities only.

The court notes that the first motion for summary judgement [d/e 165] is filed on behalf of four medical defendants: Dr. Funk, Dr. Larson, Barthold and Ellinger. This motion addresses claims # 3, 10, 12, 14. The second motion for summary judgement [d/e 166] is filed on behalf of most of the Illinois Department of Corrections Defendants including DeLong, Fairchild, Frizzell, Garlick, Germaine, Hastings, Hodge, Leonard, Libby, Mote, Mottershaw, Nolen, Pierce, Potter, Potts, Prentice, Rich, Rosenberger, Smith, Spencer, Walker and Ware. This motion addresses claims # 1, 5, 8, 14 and 21. There has been no motion filed on behalf of Defendants French, Fritsche, Brewer, Dahlback, Eckert, Gerdes or Punke.

## II. MOTIONS TO STRIKE

The defendants have filed motions to strike the plaintiff's responses to their summary judgement motions. [d/e 181, 182]. The defendants argue that the court has admonished the plaintiff that he should not file independent motions since he is represented by counsel. Nonetheless, the plaintiff has filed his own affidavit and his own memorandum in opposition to the motion for summary judgement.

The defendants are correct that the court has previously admonished the plaintiff not to file independent motions. However, in its last order, the court noted that the plaintiff has repeatedly requested to proceed on his own. The court stated that the plaintiff always has the option to represent himself. May 26, 2009 Case Management Order. Apparently, the plaintiff and his counsel have decided the plaintiff should file his own response to the dispositive motions. The court notes that the first page of the plaintiff's memorandum states it is filed with counsel. [d/e 179] Therefore, the defendants motions are denied. [d/e 181, 182]

## III. FACTS

During his time at the Pontiac Correctional Center, the plaintiff either resided in the Mental Health Unit or segregation areas of the prison. His records indicate the following:

> August 1, 2003- August 11, 2004: segregation.
> March 11, 2004- March 4, 2005: mental health unit

3

>March 4, 2005- September 13, 2006: segregation
>September 13, 2006- transferred to Dixon Correctional Center.
>January 11, 2007- April 30, 2008: return to Pontiac, segregation.
>April 30, 2008-transferred to Menard Correctional Center.
>May 9, 2008- return to Pontiac, segregation (Def. Memo, Pierce Aff, p. 1)

Guy Pierce says he is the Deputy Director for the Illinois Department of Corrections, but was previously the Pontiac Correctional Center Warden from October of 2004 to March of 2006. In this position, Pierce says he was responsible for the overall administration of the facility and therefore delegated authority for items such as correspondence, complaints and grievances. In addition, internal affairs was responsible for investigating usual incidents, potential criminal behavior and serious violations of department rules. (Def. Memo, Pierce Aff, p. 1).

Pierce says he is not aware of any instances when staff deliberately exposed the plaintiff to known risks of physical harm or where internal affairs had substantiated any claims made by the plaintiff. (Def. Memo, Pierce Aff, p. 1)

Pierce says several factors are considered in deciding whether to allow an inmate's request for placement in protective custody such as: 1) the inmate's size, stature, age, degree of aggressiveness, criminal history and any history of being victimized; 2) the identification of a specific individual who has threatened, or can be expected to threatened or physically harm the individual; 3) any institutional records indicating the person has had previous difficulties adjusting to general population due to pressures from other inmates; 4) any written or verbal reports from correctional employees or others; or 5) other information that convinces the officer that protective custody placement is necessary. (Def. Memo, Pierce Aff, p. 1-2).

Pierce says at the times relevant in the plaintiff's complaint, he is unaware of any greater risk of harm for inmates in segregation as opposed to inmates in protective custody or the mental health unit.

>Security concerns which may necessitate an inmate's transfer from general
>population to protective custody are adequately addressed in segregation
>areas at Pontiac and in the Pontiac Mental Health Unit. Accordingly, there
>would be no need to transfer a segregation inmate to protective custody at
>Pontiac. Double celling is not permitted in the segregation areas at Pontiac
>or in the Pontiac Mental Health Unit. Additionally, there are heightened
>security measures taken by staff to minimize the risk of disruptive and
>assaultive behaviors in segregation areas at Pontiac and the Pontiac Mental
>Health Unit. (Def. Memo, Pierce Aff, p. 2)

Dennis Barthold says he is employed by Wexford Health Sources (herein Wexford) as a registered nurse at Pontiac Correctional Center. Barthold says he has reviewed the plaintiff's

medical records which demonstrate that the plaintiff was seen by medical personnel on October 16, 2004, for injures he said he received from another inmate. (Def. Mot, Bart. Aff, p. 2).   The record indicates the plaintiff was examined, but did not appear to suffer from any serious injuries.(Def. Mot, Bart. Aff, p. 2).   The nurse noted that there were no signs of bruising, swelling or other injuries.

An incident report dated October 16, 2004, was prepared by Officer Fritsche.   The officer says he was escorting the plaintiff down a gallery when another offender reached through his cell bars and grabbed the plaintiff aggressively and pulled him against the cell bars.   Officer Fritsche says he separated the two offenders and escorted the plaintiff down the gallery.   The report notes that the plaintiff was seen by a medical technician. (Def. Mot, Oct. 16, 2004 Incident Rept). In his deposition, the plaintiff admits he was seen by a nurse shortly after the inmate attack on October 16, 2004 (Def. Memo, Dupree Depo., p. 26)

On May 1, 2005, an incident report was written by Officer Brewer.   Brewer says at 9:14 a.m. he was touring the gallery when the plaintiff asked to see a crisis team member.   Brewer told the plaintiff that Dr. Larson would in soon and he would make sure the doctor saw the plaintiff.   The officer then observed the plaintiff take a cup from his cell that appeared to contain liquid soap and drink it.   The officer informed Dr. Larson and the plaintiff was placed on a ten minute observation watch. (Def. Memo, May 1, 2005 Incident Rept.)

Dennis Larson says he was employed by Wexford as a physician at Pontiac Correctional Center during the time frames of the plaintiff's complaint.  Larson says the medical records demonstrate that on May 1, 2005, the plaintiff received emergency medical treatment at 10:20 a.m. after he allegedly drank liquid soap.  The plaintiff received treatment and was placed on suicide watch. (Def. Mot, Larson Aff, p. 2)  Dr. Larson says he does not recall seeing any cuts on the plaintiff's body on that date.   Dr. Larson says if he had observed any cuts or if the plaintiff had reported any cuts, it would have been documented in the medical record and it is not. (Def. Mot, Larson Aff, p. 2)   Dr. Larson days the medical unit does not have a policy of treating inmates for only one injury per sick call visit.  In addition, the plaintiff was not seen as a sick call patient on this day, but as a urgent care patient. (Def. Mot, Larson Aff, p. 2).

Judy Ellinger says she was the Director of Nursing at Pontiac Correctional Center during the time frame of the plaintiff's complaint.  Ellinger says she was not personally involved in dispensing medication to any of the inmates, but she would respond to complaints sent to her concerning general nursing issues. (Def. Memo, Ell. Aff, p. 1).

Ellinger says she has reviewed the plaintiff's medical records and says "the vast majority of times when (the plaintiff) did not receive his medications were when he willfully refused them, or when he would repeatedly masturbate when a nurse approached his cell to pass his medications." (Def. Memo, Ell. Aff, p. 1-2). Ellinger says she recalls only two times she was personally involved in medication issues with the plaintiff.   In January of 2005, a nurse forgot to

provide a certain medication to the plaintiff "due to the fact that the medication in question was to be administered at noon, rather than the regularly scheduled times for passing medications at the facility." (Def. Memo, Ell. Aff, p. 2). In March of 2006, a pharmacy technician made an error in scheduling the plaintiff's morning and afternoon medications.

Ellinger says on both occasions, the plaintiff complained to her and she responded in writing. (Def. Memo, Ell. Aff, p. 2). The first response was provided five days after the plaintiff's complaint and simply says that Ellinger addressed the incident with the appropriate nurse. (Def. Memo, Jan. 10, 2005 Memo). The second response was provided one day after the plaintiff complained and states an error was made and the technician knows she needs to be more careful in the future. Ellinger then asks the plaintiff why he refused his medications that morning. (Def. Memo, Mar. 13, 2006 Memo).

Dr. Arthur Funk says he was the medical director at Pontiac Correctional Center during the time frames of the plaintiff's complaint. Dr. Funk says he would occasionally treat individual inmates. Dr. Funk says he believes he first saw the plaintiff on November 25, 2003. (Def. Memo, Funk Aff, p 1)

The plaintiff reported that he has blood in his urine, but when he provided a sample to medical staff, it appeared normal in color. However, further testing revealed there were microscopic traces of blood. "Given the fact that (the plaintiff) was so adamant that there was blood in his urine, and the fact that the minute amount of blood in his urine was invisible, I found it strange that (the plaintiff) would know of the presence of blood, unless he had tampered with the unsupervised sample." (Def. Memo, Funk Aff, p. 1-2).

The plaintiff was provided a drink of water and asked to provide another urine sample. The plaintiff was either unable or unwilling to do so. Therefore, the plaintiff was placed in the infirmary, instructed to drink more water and notify personnel when he was able to provide a urine sample. (Def. Memo, Funk Aff, p 2) The plaintiff remained in the infirmary from November 25, 2003 to December 1, 2003. During this time, he did not follow the medical staff's directions and would not provide a supervised urine sample. (Def. Memo, Funk Aff, p 2). During his stay the plaintiff was also observed masturbating on two occasions and claiming he was unable to obtain an erection and needed to see a "penis doctor." (Def. Memo, Funk Aff, p 2). The plaintiff was eventually discharged after he provided a supervised urine sample that did not contain any blood.

Dr. Funk says to the best of his knowledge, this was his only personal involvement with the plaintiff. (Def. Memo, Funk Aff, p 2). The doctor says he was promoted to Regional Medical Director in May of 2005, and no longer provided medical treatment to individual inmates.

Terri Anderson says she is a Chairperson of the Office of Inmate Issues. Anderson says

she has also worked at the Administrative Review Board (herein ARB) Chairperson and her duties include reviewing and responding to inmate grievances. (Def. Memo, Ander. Aff, p. 1) Anderson says the ARB assists the Director of the Illinois Department of Corrections by reviewing inmate correspondence and grievance appeals. "In fact, inmate correspondence and grievance appeals addressed to the Director are automatically routed to the ARB." (Def. Memo, Ander. Aff, p. 2). Anderson says Director Walker:

> does not receive, review, or respond to inmate correspondence or grievance appeals. Instead, Director Walker's signature is affixed to response to inmate correspondence and grievance appeals by various members of the ARB, including myself, who have the authority to review and sign on the Director's behalf as administrative designees. (Def. Memo, Ander. Aff, p. 2)

Brian Fairchild says he is also a Chairperson with the Office of Inmate Issues and was employed as the Freedom of Information Officer for the Department until April of 2009. Fairchild says the procedure for responding to Freedom of Information Act requests is clearly outlined. Fairchild says he is unaware of any instances in which the plaintiff was impermissibly denied access to the law library or his legal property. (Def. Memo, Fair. Aff, p. 1).

John Garlick says he is a Psychologist Services Administrator at Pontiac Correctional Center. Garlick says Dr. Edward Smith was a licensed psychologist that provided mental health services to inmates including individual and group therapy sessions, crisis evaluation and routine rounds. However, Dr. Smith is no longer employed at Pontiac Correctional Center. (Def. Memo, Garlick Aff, p. 1).

Garlick says neither he nor Dr. Smith were permitted to prescribe medication to inmates. Only psychiatrists and other medical doctors could prescribe medication. (Def. Memo, Garlick Aff, p. 1)

Garlick says he has reviewed the mental health records for the plaintiff. On December 232, 2003, Dr. Andrew Kowalkowski was the treating psychiatrist who interviewed the plaintiff. Dr. Kowalkowski recommended that the plaintiff be transferred on a voluntary and non-emergency basis to the Pontiac Mental Health Unit for further evaluation and treatment. The plaintiff was transferred on March 11, 2004. (Def. Memo, Garlick Aff, p. 1).

On March 26, 2004, Garlick says the plaintiff exposed his genitals to a high school group that was touring the facility. The plaintiff was transferred to a cell with a solid door. The plaintiff complained that he should not be in the cell due to panic attacks, but Dr. Angus advised that there was nothing in his medical record which would indicate the plaintiff could not be placed in the cell. (Def. Memo, Garlick Aff, p. 1).

On December 6, 2004, the plaintiff asked about moving to the West Cell House if he

were to sign out of the Mental Health Unit.  The plaintiff indicated this was the only way he would consider signing out of the unit. (Def. Memo, Garlick Aff, p. 2) On December 15, 2004, the plaintiff said he would sign out of the Mental Health Unit, but wanted to know which cell house he would be assigned to.  The plaintiff was told this was a decision for the security staff. (Def. Memo, Garlick Aff, p. 2).  The plaintiff complained about his cell assignment on January 10 and January 19, 2005.

On February 17, 2005, the plaintiff was seen by a medical technician after he said he was kicked in the groin by another inmate.  The plaintiff also complained of bleeding.  The technician noted no swelling, but detected a small amount of blood.   The plaintiff was sent to sick call per Dr. Larson. (Def. Memo, Garlick Aff, p. 2).  The plaintiff was examined by a medical doctor the next day.

Garlick says while the plaintiff was assigned to the mental health unit:

> (The plaintiff) was frequently sarcastic and challenging toward the facilitators of group therapy sessions.  (The plaintiff) often used individual therapy contacts to voice complaints about staff.  While (the plaintiff) complained of anxiety-like symptoms, he was not open to learning anxiety management techniques.  Rather, (the plaintiff) indicated that the only thing that would alleviate his reported symptoms was a move to 4 gallery in the Pontiac Mental Health Unit. (Def. Memo, Garlick Aff, p. 2)

Garlick says the Placement Review Committee met to discuss the need for the plaintiff's continued placement in the mental health unit on March 1, 2006. The committee was made up of Dr. Smith, Dr. Fischer, Assistant Warden Michael Melvin and Garlick.

> The committee agreed unanimously that Mr. Dupree did not meet the criteria for specialized mental health setting at that time.  It was noted that (the plaintiff) instigates arguments and agitates seriously mentally ill offenders.  (The plaintiff) also masturbates in the presence of female staff.  Three other offenders attempted to assault (the plaintiff) due to his persistent antagonistic interactions.  (The plaintiff) was found to have a shank in his cell.  (The plaintiff) stated that he would stop filing lawsuits and grievances against staff if Lt. French would move him to an open barred cell. (Def. Memo, Garlick Aff, p. 2)

The plaintiff was moved out of the mental health unit on March 4, 2005.   The plaintiff denies he masturbated and denies the shank was his. (Dupree Aff, p. 2)

Garlick says that during the plaintiff's incarceration, his mental health condition has been extensively and thoroughly evaluated and treated by trained professionals and staff. (Def. Memo, Garlick Aff, p. 3).

Paula Rich is a paralegal assistant at Pontiac Correctional Center who assists inmate in effective ways to use the law library to do research. Rich says the law library and its staff do not have control over an inmate's legal boxes when they are in segregation or the mental health unit. Rich says she cannot authorize access to these boxes and neither can Senior Paralegal Mark Spencer or Correctional Counselor Hastings. Rich says this authorization must come from the personal property office. Rich says she is not aware of any instances when the plaintiff was improperly denied access to the law library or his legal materials. (Def. Memo, Rich Aff, p. 1)

## IV. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56c. Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

"Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e).

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

## V. ANALYSIS

A. DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL CONDITION

The defendants argue that the plaintiff can not demonstrate that they violated his Eighth Amendment rights. The plaintiff must pass both an objective and a subjective test in order to establish that the defendants violated the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981); *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). The first prong of the test requires the plaintiff to demonstrate that the alleged deprivation was sufficiently serious. *Id.* The Seventh Circuit has acknowledge that a "serious medical need" is far from "self-defining." *Gutierrez v Peters,* 11 F3d 1364, 1370 (7th Cir. 1997). However, the court noted that the Supreme Court clearly intended to include not only conditions that are life-threatening, but also those in which denial or delay in medical care results in needless pain and suffering. *Id.* On the other hand, "to say that the Eighth Amendment requires prison doctors to keep an inmate pain-free in the aftermath of proper medical treatment would be absurd." *Snipes v Detella,* 95 F. 3d 586, 592 (7th Cir. 1996).

The second prong of the Eighth Amendment test requires the plaintiff to show that the defendants acted with deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A] finding of deliberate indifference requires evidence that the official was aware of the risk and consciously disregarded it nonetheless." *Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997)(citing *Farmer* at 840-42) Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v Jones*, 823 F.3d 1068, 1072 (7th Cir. 1987). In addition, inmates are not entitled to a specific type of treatment, or even the best care, only reasonable measures to prevent a substantial risk of serious harm. *Forbes v. Edgar,* 112 F.3d, 262, 267 (7th Cir. 1997). Deliberate indifference is "something approaching a total unconcern for [the plaintiffs'] welfare in the face of serious risks, or a conscious, culpable refusal to prevent harm." *Duane v Lane,* 959 F.2d 673, 677 (7th Cir. 1992).

"[P]roof of deliberate indifference may be found where a prison official intentionally denies or delays access to medical care or intentionally interferes with the treatment once prescribed." *Jones v. Natesha* ,151 F.Supp.2d 938, 945 (N.D. Ill. 2001) *citing Ford,* 2001 WL 456427 at 6. However, "an inmate who complains that delay in medical treatment rose to constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). Delays that cause "needless hours of suffering" can constitute harm. *Gil v. Reed,* 381 F. 3d 649, 662 (7th Cir. 2004).

CLAIM #1: The plaintiff's complaint alleges that Dr. Garlick and Dr. Smith changed the plaintiff's medications repeatedly to make him appear incompetent. However, in his deposition, the plaintiff now says this is not his intended claim. The plaintiff says he is alleging that Defendants Garlick and Smith kicked him out of the mental health unit when he refused to drop his litigation against him. (Def. Memo, Plain. Depo, p. 31)

First, the plaintiff has had more than ample time to clarify this claim since it was first identified by the court on April 4, 2006. *See* April 4, 2006 Court Order. The plaintiff chose not

to amend his claim and consequently this allegation is not before the court. Second, even if the court were to consider this retaliation claim, the court would grant the motion for summary judgement.

Although it is easy to state a retaliation claim, the burden of proving the claim is heavy. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996); *see also Cole v Litscher*, 2005 WL 627791 (W.D. Wis. March 15, 2005). A prisoner must prove that his constitutionally protected conduct was a substantial or motivating factor in a defendant's actions. *Spiegla v. Hull*, 371 F.3d 928, 942-43 (7th Cir. 2004). Once the plaintiff proves that an improper purpose was a motivating factor, the burden shifts to the defendant to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct. *Id.* at 943. Therefore, if a prison officer's actions are supported by legitimate penological concerns, the retaliation claim fails as a matter of law. The record before the court establishes a legitimate penological concern for transferring the plaintiff out of the mental health unit. The court will therefore dismiss Claim # 1.

CLAIM #3: The plaintiff alleges that Nurse Ellinger failed to regularly provide his prescribed medications. In his deposition, the plaintiff could not recall which medications he did not receive and which dates he was refused medication. (Def. Memo, Dupree Depo, p. 9-10), Defendant Ellinger did not dispense medications to the plaintiff and responded to the two complaints filed by the plaintiff concerning his medications. The plaintiff admits he received these responses. (Def. Memo, Dupree Depo., p. 15-16) In addition, Ellinger states that the plaintiff often refused his medication or chose to masturbate when a nurse was dispensing medication. The plaintiff cannot take affirmative steps to prevent receiving his medication and then blame the defendants for the results of his actions.

In his response to the dispositive motion, the plaintiff again says that Nurse Ellinger interred with his medications, but still provides no specific dates or instances. He does present a letter from Defendant Garlick who states that there was a two day gap in one medication provided to the plaintiff. However, this occurred when the prescription ran out and it was immediately renewed when it was brought to the attention of medical staff. (Plain Resp, p.5, 6, Ex U, J-22). There is no indication that Defendant Ellinger was involved in this incident or in the day-to-day dispensing of the plaintiff's medication, and there is no evidence of deliberate indifference. The court will grant summary judgement as to Claim #3.

CLAIM #7: The plaintiff alleges that Defendants Ware, Prentice, Rosenberger and Frizzell were deliberately indifferent to his medical needs on February 17, 2005. The medical records demonstrate that the plaintiff was examined by medical staff and the plaintiff admits this in his deposition. (Def. Memo, Plain. Depo, p. 54). The plaintiff bases his lawsuit on his claim that the nurse stated that a black officer had told the nurse not to treat the plaintiff. The plaintiff assumed that officer had to be Defendant Ware and has no idea if Prentice, Rosenberger or Frizzell were involved. In his response to the summary judgement motion, the plaintiff again

says he has evidence that someone told the nurse not to treat him.  Even if the plaintiff could prove this, the plan was not successful since the plaintiff did receive medical care.  ( Plain Resp., p. 7)   The plaintiff has not demonstrated a sufficient basis for a claim of deliberate indifference.

Furthermore, since the evidence shows the plaintiff was provided medical care, the plaintiff cannot succeed on his claim that the defendants participated in a conspiracy to prevent him from receiving medical care or retaliated against him by denying medical care. Therefore, the court will also dismiss Claims # 6 and 8.

CLAIM # 10:  The plaintiff claims Dr. Larson was deliberately indifferent to his injuries on May 1, 2005.  Again, the medical records show the plaintiff was seen by Dr. Larson on this date.  The plaintiff was treated for the only condition reported when an officer thought the plaintiff has consumed liquid soap.  No cuts or other injuries were observed.   The plaintiff has failed to proffer any evidence of deliberate indifference.

CLAIM #12: The plaintiff alleges that Dr. Funk was deliberately indifferent from July of 2003 to the present when he failed to treat the plaintiff for blood in his urine.  Dr. Funk has provided evidence that he provided treatment to the plaintiff on the only occasion he had any personal contact with him in November and December of 2003.  There is no evidence the plaintiff had any further contact with Dr. Funk.  In addition, the medical record demonstrates that the plaintiff was not cooperative with treatment when he did see Dr. Funk in November and December of 2003, and further testing at the time revealed no blood in the plaintiff's urine..

The plaintiff says he did have a continuing problem with blood in his urine. (Plain Resp, pl 6).  The plaintiff says a Dr. Baker recommended that he see a urologist, but this request was denied. (Plain Resp, p. 7).  The plaintiff has presented no evidence in support of this claim.

The plaintiff has also presented a medical record dated August 3, 2007, which seems to indicate the plaintiff again had blood in his urine.  However, the plaintiff was obviously receiving medical care based on the medical record he presented in support of his claim.  There is no evidence before the court that this is a continuing problem or that Dr. Funk had any contact or communication with the plaintiff after November and December of 2003.  In fact, Dr. Funk was working as the Regional Medical Director after May of 2005.

CLAIM #14: The plaintiff says Lieutenant Potter and Officer Barthold denied him medical attention after he was injured on October 16, 2004.  In his deposition, the plaintiff claims he was attacked by another inmate on October 16, 2004 and was denied all medical attention for his injuries.  The medical records demonstrate the plaintiff was seen by medical staff on this day and had no obvious injuries.   The plaintiff has failed to present any evidence in support of his claims.

The court also notes the plaintiff has presented no evidence that he suffered any detrimental effect due to a delay in receiving medical treatment at any time. Therefore, the court will dismiss claims #1, 3, 6, 7, 8, 10, 12, 14.

B. MEANINGFUL ACCESS TO THE COURTS.

The defendants maintain that the plaintiff cannot demonstrate that he was denied meaningful access to the courts. Prison officials have an affirmative duty to provide inmates with meaningful, but not unconditional, access to the courts. *Bounds v. Smith,* 430 U.S. 817, 825 (1977). The withholding of legal materials from inmates will not violate the right of access to the courts unless it prejudices a potentially meritorious legal challenge. *See Lewis v. Casey,* 518 U.S. 343, 351 (1996); *Marshall v Knight,* 445 F.3d 965, 968 (7th Cir. 2006). The plaintiff must show "some quantum of detriment caused by the challenged conduct." *Jenkins v Lane,* 977 F.2d 266, 268 (7th Cir. 1992). Simply alleging that the defendants caused a delay in ligation is not enough. "Regardless of the length of an alleged delay, a prisoner must show actual substantial prejudice to specific litigation." *Gentry v. Duckworth,* 65 F.3d 555, 559 (7th Cir. 1995).

In his complaint, the plaintiff alleges the defendants refused to give him legal copies of grievances and exhibits, denied him access to notaries, denied him access to his stored legal materials, denied him access to the law library, denied him blank Freedom of Information forms and falsified documents. However, the plaintiff has failed to provide any evidence that these defendants violated his constitutional rights.

In some instances, the plaintiff has failed to show the named defendants had any personal involvement in the plaintiff's claims. For instance, Defendants Rich, Spencer and Hastings had no authority to allow the plaintiff access to his stored legal materials and are unaware of any times he was impermissibly denied access to his documents. In addition, the plaintiff has provided no evidence that Defendants Mote, Pierce and Walker were aware of his claims. A defendant cannot be held liable under 42 USC §1983 unless the plaintiff can demonstrate that the defendant's caused or participated in the alleged constitutional violation. *McBride v. Soos*, 679 F.2d 1223, 1227 (7th Cir. 1982). The mere fact that a defendant was a supervisor is insufficient to establish liability because the doctrine of *respondeat superior* (supervisor liability) does not apply to actions filed under 42 USC §1983. *Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). For a supervisor to be held liable under 42 U.S.C. § 1983, he "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye. . ." *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988).

Defendant Fairchild has also stated that the plaintiff was not required to submit his Freedom of Information Act requests on a particular form. (Def. Memo, Fairchild Aff, p. 1) The plaintiff therefore had no need for blank forms.

Most importantly, the defendants argue that even if the plaintiff could demonstrate that he was denied meaningful access to the courts, he has no evidence that he suffered any actual injury. The plaintiff has alleged that he was unable to file a timely habeas corpus action and to file an exhaustive request for executive clemency. However, the plaintiff has not been able to provide any detail to support that claim. (Def. Memo, Plain. Depo, p. 45) *See Tarpley v. Allen County Indiana,* 312 F.3d 895, 899 (7th Cir. 2002)("long list of deficiencies" not sufficient; plaintiff must have evidence that defendants prevented him from pursuing a nonfrivolous legal claim.) The plaintiff has provided no further evidence in support of his claim in his response to the dispositive motion. The court will therefore dismiss Claim #5.

C. FAILURE TO PROTECT.

The defendants argue the plaintiff cannot demonstrate they failed to protect him from inmate assaults by refusing to place him in protective custody. Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners." *Mayoral v. Sheahan*, 245 F.3d 934, 938 (7th Cir. 2001). However, to succeed, the plaintiff must show that a "substantial risk of serious harm" existed and that the guard subjectively disregarded that risk." *Farmer v. Brennan*, 511 U.S. 825, 834, 837 (1994). Liability attaches under the Eighth Amendment when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* "[A] negligent failure to protect an inmate from harm by fellow inmates is not actionable under the Eighth Amendment or directly under the Due Process Clause." *Lewis El v. O'Leary*, 631 F.Supp. 60, 62 (N.D.Ill.1986)

The plaintiff alleges from August of 2003 to the present, Defendants Walker, Libby, Hodge, Nolen and Pierce failed to put him in protective custody or to take any action to protect him. Instead, the plaintiff claims the defendants continued to place him near dangerous inmates and he continues to be assaulted to this day.

The evidence before the court shows that at all times the plaintiff was in Pontiac Correctional Center, he was housed either in the Mental Health Unit or in segregation. In fact, the record shows the plaintiff chose to be housed in the Mental Health Unit and was only released from this area when he failed to cooperate with treatment and was found to be disruptive. The plaintiff has not demonstrated that there are any greater security measures in protective custody as compared to the areas of the prison where he resided. The plaintiff has also failed to show that the defendants were aware the plaintiff faced an excessive risk to his health or safety prior to any assault. The plaintiff has also failed to provided clear evidence that he faced a number of inmate assaults.

14

The plaintiff has also named defendants such as Walker, Libby, Hodge and Nolen who do not make the decision of where an individual inmate is to be housed and therefore have do not have the required personal involvement in the plaintiff's claim to be held liable.   The plaintiff alleges he sent these defendants 19 different letters and grievances, but they took no action.   The plaintiff has still failed to show that any of these defendants is personally involved or liable for his claim. *Diaz v McBride,* 1994 WL 750707 (N.D. Ind. Sept. 12, 1994) (Inmate's complaints and letters insufficient to show personal involvement on part of prison officials); *Crawford v. Roth,* 1994WL 96659 (N.D. Mar. 22, 1994)(prison warden's failure to respond to letter insufficient to subject warden to personal liability under §1983);*Reed v Richards,* 1992 WL 396863 (N.D. Dec. 31, 1992)(sending official various letters or grievances did not subject prison official to liability).

Since the plaintiff has not demonstrated that the defendants failed to protect him, his claims of conspiracy and retaliation also must fail.  The court will granted summary judgement as to claim #21.

## CONCLUSION

The court will grant summary judgement as to claims # 1, 3, 5, 6, 7, 8, 10, 12 and 14.  Therefore, the court has the following surviving claims against Defendants Brewers, Gerdes, Eckhert, Dahlback, French, Fitsche and Punke:

> 9) The plaintiff says on May 1, 2005, Officer Brewers and Gerdes violated both is Eighth Amendment and First Amendment rights when they used excessive force in retaliation for his grievances and litigation.
> 13) The plaintiff states on  November 1, 2005, Officer Eckhert painfully pulled on his waist chain and/or hit him with handcuffs and Officer Dahlback did the same on September 7, 2004 violating his Eighth Amendment right to be free from excessive force.
> 16) The plaintiff says on June 13, 2005, Officer Punke violated the Eighth Amendment when he refused to provide needed  medical care.  The plaintiff says he was on suicide watch and the officer allowed him to have some kind of cutting devise and told the plaintiff to "cut deeper." (Comp, p 5-b)
> 17) Officers French and Fritsche conspired against the plaintiff and retaliated against him by allowing inmates to attack the plaintiff on October 2, 2004.
> 18) Officers French and Fritsche  were deliberately indifferent to the plaintiff's serious medical needs on October 2, 2004and allowed the attacks in retaliation for previously filed grievances and litigation.

**IT IS THEREFORE ORDERED that:**

**1) The defendants motions to strike the plaintiff's responses to the summary judgement motions are denied. [d/e 181, 182].**

**2) The defendants motions for summary judgement are granted pursuant to Fed. R. Civ. P. 56. [d/e 165, 166]   The clerk of the court is directed to dismiss all defendants EXCEPT Defendants Brewers, Gerdes, Eckhert, Dahlback, Punke, French, and Fritsche who remain in this case.   The surviving claims are as outlined in this order.**

**3) The final pretrial conference remains as set on October 30, 2009 at 1:30 p.m.** *See* **May 1, 2009 Text Order.   The proposed pretrial order must be submitted to the clerk of the court on or before October 26, 2009.  The proposed order must include (1) the name, prison number, and place of incarceration for each inmate to be called as a witness; 2) the name and place of employment for each Illinois Department of Corrections employee to be called as a witness; and 3) the names and addresses of any witnesses who are not inmates or IDOC employees for whom a party seeks a trial subpoena.**

**4) The parties are reminded that they must disclose expert witnesses and expert testimony pursuant to the requirements of Fed. R. Civ. P. 26(a)(2)(A)c at least 90 days before the trial date set forth below.**

**5)  A jury trial remains as scheduled on November 2, 2009 at 9:00 a.m. at the U.S. Courthouse, 201 S. Vine St., Urbana, IL.  The plaintiff and the defendants shall appear in person before the court sitting in Urbana.  Inmates of the Illinois Department of Corrections who are not parties to this case shall appear by video conference and IDOC employees who are not parties may appear by video conference.**

Enter this 26th day of August, 2009.

                                      s\Harold A. Baker
                                    _____
                                     HAROLD A. BAKER
                              UNITED STATES DISTRICT JUDGE